## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

DAVID J. YEAGER,

    Plaintiff,

       v.

COVENANT SECURITY SERVICES,
LTD.,

    Defendant.

Civil No. 15-6012 (RMB/AMD)

**OPINION**

APPEARANCES:

David F. McComb, Esq.
Zachary Adam Silverstein, Esq.
Zarwin Baum DeVito Kaplan Schaer & Toddy PC
1818 Market Street, 13th Floor
Philadelphia, PA 19103
    *Attorneys for Plaintiff David J. Yeager*

William M. Tambussi, Esq.
Michael J. Watson, Esq.
Brown & Connery, LLP
360 Hadden Avenue
P.O. Box 539
Westmont, NJ 08108
    *Attorneys for Defendant Covenant Security Services, Ltd.*

**BUMB**, UNITED STATES DISTRICT JUDGE:

This matter comes before the Court upon the Motion for Summary Judgment [Docket No. 24] by Defendant Covenant Security Services, Ltd. ("Covenant" or the "Defendant"), seeking the dismissal of the above-captioned matter by Plaintiff David J. Yeager ("Yeager" or the "Plaintiff") in its entirety. Having

considered the parties' submissions and for the reasons set forth below, Defendant's Motion for Summary Judgment is granted, in part, and denied, in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND[1]

This dispute stems from Defendant's decision to terminate Plaintiff's employment on October 31, 2014. Plaintiff alleges that he was terminated unlawfully and in retaliation for his support of a former co-worker's unlawful termination lawsuit against Covenant.

Covenant provides security and protection services to clients at facilities across the country. Def. SOMF ¶ 1. Plaintiff was hired by Covenant as a security officer in the summer of 2011. Id. ¶ 10. On August 1, 2011, Plaintiff signed a Handbook Acknowledgement Form, acknowledging that he had received Covenant's Employee Handbook and that he would become familiar with the policies set forth in the Handbook. Def.

---

[1] In his Response to Defendant's Statement of Undisputed Facts, Plaintiff repeatedly states "Denied as the document speaks for itself." See, e.g., Pl. Resp. to Def. SOMF ¶¶ 4-7, 14-30, 38, 42, 131-33 [Docket No. 26-2]. Plaintiff, however, does not dispute that the referenced documents do, in fact, support Defendant's statements. The Court finds that these facts have not been genuinely disputed and, therefore, will be deemed undisputed for purposes of resolving the instant motion. See D.N.J. L. Civ. R. 56.1 ("any material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."). To the extent that certain facts are not genuinely disputed, the Court relies upon Defendant's Statement of Material Facts Not in Dispute ("Def. SOMF") [Docket No. 24-2]. The Court relies upon the record for genuinely disputed facts.

Ex. 4 [Docket No. 24-4]. On October 15, 2011, Plaintiff was promoted to the position of site manager. Def. Ex. 6 [Docket No. 24-5]. On November 22, 2011, Plaintiff underwent supervisory training, which included training regarding Covenant's sexual harassment policies and procedures. Def. SOMF ¶ 12.

Covenant's Employee Handbook expressly prohibits harassment of any kind, including sexual harassment. Id. ¶ 16. Specifically, the Employee Handbook provides that "[a]ny employee who believes that he or she has been a victim of some form of sexual or other harassment, or other inappropriate conduct or behavior, should report the incident immediately to his or her supervisor, the Human Resources Manager or any member of senior management with whom the individual feels comfortable." Def. Ex. 2 at DEF 37 [Docket No. 24-3] (emphasis in original). It further states: "If reported to a supervisor, the supervisor fills out a 'Preliminary Complaint Form', having the employee briefly describe what incident has occurred. The supervisor does not investigate the complaint – it must be immediately forwarded to the Human Resources Manager." Id. (emphasis in original). Additionally, the Handbook states that "[r]eports of harassment must be reported in a timely manner to ensure a quick and effective investigation of the incident. It

will be extremely difficult to investigate harassment claims made long after the alleged incident occurred." Id. at DEF 38.

Covenant also promulgates a "Harassment Free Workplace" Policy, which applies to all Covenant employees. Def. Ex. 11 at DEF 65 [Docket No. 24-6]. The Policy provides, in relevant part:

> All supervisors and other members of management are held accountable for the effective administration of this Policy. . . . If a supervisor or other member of management is advised of any alleged violation of this Policy, . . . he/she must immediately report the matter to the Human Resources Department or to a senior member of management so that an appropriate investigation can be initiated. Failure to do so will result in corrective action up to and including termination.

Id. at DEF 68. The Policy also directs supervisors to "report harassment claims to the HR Department for investigation as soon as possible, and in most instances, no later than 24-hours of the occurrence." Id. at DEF 69. Plaintiff was responsible for being generally aware of Covenant's sexual harassment reporting policies. 2015 Pl. Dep. Tr. 75:2-4, Def. Ex. 14 [Docket No. 24-6]. Likewise, Plaintiff knew that he was supposed to report complaints of sexual harassment to Human Resources. Id. 86:24-87:10.

On or about January 10, 2013, Abigail Geoffney, a Covenant security officer at the time, reported sexual harassment by her supervisor, Norman Reed, to Plaintiff. Def. SOMF ¶¶ 35-36. Plaintiff documented Geoffney's complaints in a Preliminary

Description of Incident Form, which he emailed to Covenant's Human Resources Department the same day. Id. ¶ 37. Upon receipt of the complaint, Covenant's Human Resources Specialist, Ashley Dennis, began an investigation into the allegations. Id. ¶ 39. Ultimately, after investigating, Covenant determined that it was unable to substantiate Geoffney's allegations. Id. ¶ 46.

During the relevant time period, Plaintiff supervised Meegan Wadleigh, a security officer employed by Wadleigh. Def. Ex. 25 ¶ 8 [Docket No. 24-8]. On May 8, 2013, Wadleigh reported to Plaintiff that she had been sexually harassed by another Covenant employee, Scott Tucker. Def. SOMF ¶ 52. Plaintiff documented and signed Wadleigh's complaint, which also included a description of the incident by Wadleigh. Id. ¶ 53. Plaintiff did not immediately send the May 8, 2013 report to Covenant's Human Resources Department, and instead noted: "no witness need proof." Def. Ex. 27 [Docket No. 24-8]; Def. Ex. 25 ¶ 2; Def. Ex. 28 [Docket No. 24-8]; 2015 Pl. Dep. Tr. 51:18-25, Def. Ex. 14.

On May 9, 2013, Wadleigh reported a second instance of sexual harassment by Tucker to Plaintiff. Plaintiff documented the complaint, which included Wadleigh's description of the incident, and signed it the same day. Def. SOMF ¶¶ 56-57. Plaintiff did not immediately send the May 9, 2013 report to Human Resources. Def. Ex. 25 ¶ 2; Def. Ex. 28; 2015 Pl. Dep.

Tr. 79:19-80:9, Def. Ex. 14.  Once again, he wrote "need proof or witness" under "Action to be taken".  Def. Ex. 31 [Docket No. 24-8].

Wadleigh reported a third incident of sexual harassment by Tucker to Plaintiff on May 31, 2013.  Plaintiff documented Wadleigh's description of the alleged harassment and signed the complaint on the same day.  Def. SOMF ¶¶ 60-61.  Under "Action to be taken", Plaintiff wrote: "No witness / need someone Goffney [sic] complaint went nowhere.  problem!"  Def. Ex. 32 [Docket No. 24-8].  Plaintiff did not immediately report Wadleigh's May 31, 2013 complaint to Human Resources.  Def. Ex. 25 ¶ 2; Def. Ex. 28; 2015 Pl. Dep. Tr. 86:2-5, Def. Ex. 14.

On June 14, 2013, Wadleigh reported a fourth incident of sexual harassment by Tucker to Plaintiff.  Plaintiff, once again, documented the complaint, including Wadleigh's description of the incident, and signed the form.  Def. SOMF ¶¶ 69-70.  Under "Action to be taken", Plaintiff wrote: "will set up [] camera in command center.  But only have her word against his, problem."  Def. Ex. 33 [Docket No. 24-8].  Plaintiff did not immediately report this complaint to Human Resources, as required by Covenant's reporting policies.  Def. Ex. 25 ¶ 2; Def. Ex. 28; 2016 Pl. Dep. Tr. 136:11-137:5, Def. Ex. 5 [Docket No. 24-5].

Plaintiff was the only Covenant employee who witnessed Wadleigh complete her four sexual harassment complaints. Def. SOMF ¶ 74. Wadleigh did not report Tucker's alleged sexual harassment to anyone at Covenant, except Plaintiff, during her employment with Covenant. Id. ¶ 76. Plaintiff admits that he did not notify anyone at Covenant of Wadleigh's sexual harassment complaints prior to June 20, 2013. Id. ¶ 83. Plaintiff testified that he did not immediately report Wadleigh's complaints because, in his experience, Covenant did not take sexual harassment complaints seriously unless there was corroborative evidence. 2015 Pl. Dep. Tr. 51:18-25, 88:13-18, Def. Ex. 14.

On or about June 25, 2013, Ben Goehring, an Operation Specialist at Covenant, called Plaintiff to inform him that Wadleigh was required to report to a meeting on June 27, 2013. During the call, Plaintiff told Goehring that Wadleigh "had complaints of her own." Id. ¶ 88. Specifically, Plaintiff testified that he "told Ben Goehring that [Wadleigh] had her own complaints, sexual and otherwise." 2015 Pl. Dep. Tr. 79:9-14, Def. Ex. 14. Plaintiff told Wadleigh to bring her written sexual harassment complaints with her to the meeting and to raise her complaints there. Id. 78:2-22.

Wadleigh, however, did not inform Covenant of her sexual harassment complaints during the June 27, 2013 meeting.

Wadleigh Dep. Tr. 81:4-82:6, Def. Ex. 24 [Docket No. 24-7].

During the meeting, Covenant terminated Wadleigh's employment,

purportedly due to poor performance and behavioral issues.  2015

Brown Dep. Tr. 50:4-12, 58:3-10, Def. Ex. 3 [Docket No. 24-4];

Dennis Dep. Tr. 50:12-52:1, 60:14-19, 74:7-13, Ex. 17 [Docket

No. 24-7].  Brown, Dennis, Goehring, and Dominic Ferrara,

Covenant's Senior Vice-President of Operations, each testified

that they were not aware of Wadleigh's sexual harassment

complaints at the time of her termination on June 27, 2013.

Def. SOMF ¶¶ 105-08.

That same day, Plaintiff witnessed Tucker make a racial

slur about an individual who was driving Wadleigh to her

meeting.  Id. ¶ 115.  Plaintiff completed a Corrective Action

Form regarding Tucker's conduct, which he immediately forwarded

to Human Resources.  Id. ¶ 117.  Tucker was suspended that day

as a result of this incident.  The following day, June 28, 2013,

Ferrara terminated Tucker's employment.  Ferrara Dep. Tr. 34:22-

36:12, Def. Ex. 37 [Docket No. 24-9].

On July 1, 2013, at 1:07 p.m., Plaintiff sent an email to

Dennis, which read, in relevant part: "I documented that

Ms. Wadleigh had several complaints, sexual and other, she

wanted to report to me however I instructed her to make her

complaints in Philadelphia (HR) during her meeting with you and

Ben, since I was not involved with investigation.  See

8

attached." Def. Ex. 34 [Docket No. 24-8]. To the email, he
attached a Corrective Action Form, dated June 27, 2013, which
stated: "Ms. Wadleigh asked to report her own complaints of
harassment both sexual and other. She was instructed by me,
[due] to the fact she was meeting with Covenant SOS Goehring +
HR Dennis due to pending matter, on this date at 12pm. I
advised I would document her request." Id.; see also Def.
Ex. 26 [Docket No. 24-8].

The same day, at 1:36 p.m., Plaintiff sent another email to
Dennis and Goehring, which read: "And if it was Tucker, you
would probably be quite interested in Ms. Wadleigh's sexual
harassment complaint, but again I will leave that to you[r]
discretion." Def. Ex. 35 [Docket No. 24-8].

On July 10, 2013, Wadleigh sent a letter to Brown, in which
she claimed that Tucker had sexually harassed her during her
employment with Covenant and that she had "made Dave Yeager
aware of [the] complaints." Def. Ex. 39 [Docket No. 24-9].
Brown responded to Wadleigh on July 12, 2013, in relevant part:

> Covenant has a zero tolerance policy for all forms of
> harassment, sexual or otherwise. Covenant takes these
> types of allegations very seriously . . . . Had you
> informed the company of your allegations regarding
> Mr. Scott Tucker earlier, there would have been a prompt
> and thorough investigation with the necessary action
> taken, if warranted. Because you chose not to do so,
> the company could take no action. In this instance,
> Mr. Tucker's employment with Covenant had ended prior to
> the receipt of your complaint.

Def. Ex. 40 [Docket No. 24-9].  Covenant, however, did not
institute any investigation into the substance of Wadleigh's
letter upon receiving it.  2016 Brown Dep. Tr. 28:16-29:1, Def.
Ex. 10 [Docket No. 24-6].  Brown testified that Covenant did not
believe an investigation was necessary at the time given that
both Wadleigh and Tucker had previously been terminated.  Id.
22:9-25:14, 27:7-28:2, 28:16-31:5.

On October 3, 2013, Wadleigh's attorney, David F. McComb,
sent Brown a letter, which specifically described the four
instances of sexual harassment that Wadleigh reported to Yeager
and the dates on which the alleged harassment occurred.  The
letter also stated that "Ms. Wadleigh immediately reported each
such occurrence to her supervisor, David Yeager.  Although
Mr. Yeager documented each complaint, he informed Ms. Wadleigh
that she needed more evidence because, in Mr. Yeager's
experience, Covenant did not take these types of complaints
seriously."  Pl. Ex. A [Docket No. 26-3].  McComb further noted
that it was his "understanding that prior to the [June 27, 2013]
meeting, Mr. Yeager sent Mr. Goehring an email notifying him
that Ms. Wadleigh had complained about incidents of workplace
sexual harassment and asking Mr. Goehring whether he wanted to
review Mr. Yeager's notes on the complaints.  We believe that
Mr. Yeager received no response to his inquiry."  Id.

On December 11, 2013, Wadleigh filed a complaint against
Covenant for NJLAD retaliation and wrongful termination (the
"Wadleigh Complaint"). Wadleigh Complaint, Def. Ex. 42 [Docket
No. 24-9]. In her Complaint, Wadleigh alleged that she had been
sexually harassed by Tucker on at least four occasions. She
described the four instances in detail and alleged that "[she]
immediately reported each such occurrence of harassment to her
supervisor, David Yeager. Although Mr. Yeager documented each
complaint, he informed Plaintiff that she needed more evidence
because, in Mr. Yeager's experience, Covenant did not take these
types of complaints seriously." Id. ¶¶ 7-8. Brown testified
that Covenant viewed the allegations in the Wadleigh Complaint
as "strictly allegations." 2016 Brown Dep. Tr. 29:7-30:4, Def.
Ex. 10.

On August 15, 2014, in connection with Wadleigh's lawsuit,
the parties appeared for a Court-ordered mediation (the
"Wadleigh Mediation"). Def. SOMF ¶ 130. During the Wadleigh
Mediation, but outside the presence of Covenant's
representatives, Plaintiff spoke with the mediator over the
phone. He informed the mediator that Wadleigh had reported
complaints about Tucker's sexual harassment on multiple dates
during her employment with Covenant and that Plaintiff had
documented each of the complaints. Id. ¶ 132. The mediator
then conveyed this information to Covenant's representatives.

Id. ¶ 133.  After being informed by the mediator of Plaintiff's
comments, Ferrara discussed the matter with Brown and Gregory
Iannuzzi, Covenant's President, as he was concerned that
Plaintiff had possibly violated Covenant's sexual harassment
reporting policies.  Covenant directed its attorneys to meet
with Plaintiff to discuss the matter further.  Id. ¶ 136-37.

On October 2, 2014, two of Defendant's attorneys met with
Plaintiff.  Plaintiff confirmed that Wadleigh had reported
sexual harassment by Tucker to him on four occasions during her
employment with Covenant.  Id. ¶¶ 139-40.  At the meeting,
Plaintiff also stated that he did not immediately report
Wadleigh's complaint "because there were no third-party
witnesses and he did not have enough 'evidence' to satisfy
Covenant."  Def. Ex. 28.  According to counsel's notes,
Plaintiff "conceded that he did not follow the policies as they
pertain to Wadleigh's complaints about Tucker."  Id.  Plaintiff
testified that, during this meeting, Covenant's attorneys asked
him if had "talk[ed] to anybody about this case."  2016 Pl. Dep.
Tr. 139:15-20, Def. Ex. 5.  Then, Plaintiff testified, "[o]ne of
[Covenant's] attorneys, . . . , red-headed kid, blows a gasket.
Tells me you don't f---ing talk to anybody about this case.
If anybody contacts you about this case, tell them to go f---
themselves."  Id. 139:20-25.  Counsel vigorously denies this.

12

See, e.g., Milavsky Dep. Tr. 15:13-17:20; 45:16-46:19, Def. Ex. 30 [Docket No. 24-8].

Thereafter, on October 30, 2014, Covenant held an additional meeting with Plaintiff.  Def. Ex. 29 [Docket No. 24-8].  Plaintiff, once again, stated that Wadleigh had reported complaints of sexual harassment to him on several occasions, but that he had not informed anyone else at Covenant because, in his experience, Covenant did not properly handle sexual harassment complaints if there was no proof or corroboration.  Id.  Plaintiff was terminated the following day, October 31, 2014, for "violation of Covenant's policy and procedures [and] failure to report sexual harassment."  Def. Ex. 45 [Docket No. 24-10].

Based upon these facts, Plaintiff claims that he was wrongfully terminated by Covenant due to his participation in the Wadleigh Mediation and his willingness to assist Wadleigh in her litigation against Covenant.  On or about July 2, 2015, Plaintiff commenced the instant litigation in the Superior Court of New Jersey, Law Division, Gloucester County, setting forth the following counts: violation of the New Jersey Law Against Discrimination, N.J.S.A. § 10:5-1, et seq. ("NJLAD") (Count I); and wrongful termination (Count II).  Complaint, Notice of Removal Ex. A [Docket No. 1].  Defendant subsequently removed the action to federal court on August 5, 2015 [Docket No. 1].

Defendant now moves for summary judgment and dismissal of
Plaintiff's Complaint in its entirety.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if "the movant shows that
there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law." Fed. R.
Civ. P. 56(a).  A fact is "material" if it will "affect the
outcome of the suit under the governing law[.]" Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is
"genuine" if it could lead a "reasonable jury [to] return a
verdict for the nonmoving party." Id.

In determining the existence of a genuine dispute of
material fact, a court's role is not to weigh the evidence; all
reasonable "inferences, doubts, and issues of credibility should
be resolved against the moving party." Meyer v. Riegel Prods.
Corps., 720 F.2d 303, 307 n. 2 (3d Cir. 1983).  However, a mere
"scintilla of evidence," without more, will not give rise to a
genuine dispute for trial.  Anderson, 477 U.S. at 252.
Moreover, a court need not adopt the version of facts asserted
by the nonmoving party if those facts are "utterly discredited
by the record [so] that no reasonable jury" could believe them.
Scott v. Harris, 550 U.S. 372, 380 (2007).  In the face of such
evidence, summary judgment is still appropriate "where the
record . . . could not lead a rational trier of fact to find for

14

the nonmoving party[.]"  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  Then, "when a properly supported motion for summary judgment [has been] made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'"  Anderson, 477 U.S. at 250 (citing Fed. R. Civ. P. 56(e)).  In the face of a properly supported motion for summary judgment, the nonmovant's burden is rigorous: he "must point to concrete evidence in the record"; mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment.  Orsatti v. New Jersey State Police, 71 F.3d 480, 484 (3d Cir. 1995); accord Jackson v. Danberg, 594 F.3d 210, 227 (3d Cir. 2010) (citing Acumed LLC v. Advanced Surgical Servs., Inc., 561 F.3d 199, 228 (3d Cir. 2009) ("[S]peculation and conjecture may not defeat summary judgment.")).

# III. ANALYSIS

## A. NJLAD Retaliation (Count I)

Under NJLAD, it is unlawful "[f]or any person to take reprisals against any person because that person has opposed any practices or acts forbidden under this act or because that person has filed a complaint, testified or assisted in any proceeding under this act or to coerce, intimidate, threaten or interfere with any person in the exercise or enjoyment of, or on account of that person having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by this act."  N.J.S.A. § 10:5-12(d).

Retaliation claims under NJLAD are analyzed under the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Michaels v. BJ's Wholesale Club, Inc., 604 F. App'x 180, 182 (3d Cir. 2015); Battaglia v. United Parcel Servs., Inc., 214 N.J. 518, 546 (2013) ("All LAD claims are evaluated in accordance with the United States Supreme Court's burden-shifting mechanism.").

Under this framework, a plaintiff must first establish a prima facie case of retaliation.  Michaels, 604 F. App'x at 182 (citing Craig v. Suburban Cablevision, Inc., 140 N.J. 623, 629-30 (1995)).  Once the plaintiff has established a prima facie case, "the burden then shifts to the employer to articulate a legitimate, nonretaliatory or nondiscriminatory

reason for its actions." Tourtellotte v. Eli Lilly & Co., 636
F. App'x 831, 842 (3d Cir. 2016); accord Michaels, 604 F. App'x
at 182 (quoting Lichtenstein v. Univ. of Pittsburgh Med. Ctr.,
691 F.3d 294, 302 (3d Cir. 2012) (quoting McDonnell, 411 U.S. at
802)); Delli Santi v. CNA Ins. Companies, 88 F.3d 192, 199 (3d
Cir. 1996). "If the employer produces such a reason, the burden
then shifts back to the plaintiff to prove that the employer's
nonretaliatory or nondiscriminatory explanation is merely a
pretext for the discrimination or retaliation." Tourtellotte,
636 F. App'x at 842; accord Delli Santi, 88 F.3d at 199.

### i. Prima Facie Case

To establish a prima facie case of retaliation under NJLAD,
a plaintiff must demonstrate that (1) he "engaged in a protected
activity that was known to the employer," (2) "that [he] was
subjected to an adverse employment decision," and (3) "that
there is a causal link between the activity and the adverse
action." LaPaz v. Barnabas Health Sys., 634 F. App'x 367, 369
(3d Cir. 2015) (citing Battaglia, 213 N.J. at 547).

At this juncture, the parties do not dispute that Plaintiff
engaged in a protected activity known to the employer when he
participated in the Wadleigh Mediation and indicated his
willingness to assist Wadleigh in her lawsuit against Covenant.
Additionally, as Plaintiff was terminated, the parties agree
that he was subjected to an adverse employment decision.

Defendant, however, contends that Plaintiff cannot establish a prima facie case of retaliation under NJLAD as there is no evidence in the record to establish a causal link between Plaintiff's participation in the Wadleigh Mediation and Plaintiff's termination.

"To demonstrate a prima facie case of causation, [a plaintiff] must point to evidence sufficient to create an inference that a causative link exists between [his] [protected activity] and [his] termination." Lichtenstein, 691 F.3d at 307. "When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.' Where the temporal proximity is not 'unusually suggestive,' [courts] ask whether 'the proffered evidence, looked at as a whole, may suffice to raise the inference.'" Id. (quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232 (3d Cir. 2007)).

Defendant contends that the passing of roughly eleven weeks between Plaintiff's participation in the Wadleigh Mediation on August 15, 2014 and Plaintiff's termination on October 31, 2014 is not unusually suggestive of retaliation. The Court agrees. Eleven weeks is far from unusually suggestive. See, e.g., Escanio v. United Parcel Serv., 538 F. App'x 195, 200 (3d Cir. 2013) (finding that period of roughly three weeks between

protected activity and termination, without more, is not unduly suggestive of retaliatory motive and cannot establish causal link as required to support prima facie case of NJLAD retaliation); Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir. 2003) (finding that three week period between protected activity and termination was insufficient, without other evidence, to establish required causal link); Malloy v. Intercall, Inc., 2010 WL 5441658, at *19 (D.N.J. Dec. 28, 2010) (granting summary judgment on NJLAD retaliation claim where plaintiff "pointed to no facts supporting her claim that she was terminated in retaliation for her complaint other than merely pointing to the fact that she complained and was terminated approximately two weeks later."). The timing here--without more--cannot establish causation.

Covenant also argues that there is no other evidence in the record that, coupled with timing, would raise an inference of causation. Specifically, Defendant argues that Plaintiff's termination was in no way causally related to his participation in the Wadleigh Mediation. This argument is unpersuasive. It was precisely Plaintiff's participation in the Wadleigh Mediation that triggered the investigation into Plaintiff's conduct which led to his termination. Considering the record as a whole, the Court finds that there is sufficient evidence to create an inference of causation between Plaintiff's

participation in the Wadleigh Mediation and his termination. It is undisputed that, upon learning of Plaintiff's participation in the Wadleigh Mediation, including the comments made by Plaintiff to the mediator, Covenant instituted an investigation into Plaintiff's actions regarding Wadleigh's sexual harassment complaints. Def. SOMF ¶¶ 132-33, 135-36. This chain of events is sufficient evidence from which a jury could reasonably infer a causal relationship between Plaintiff's participation in the Wadleigh Mediation and his ultimate termination.

Moreover, as will be addressed in further detail below, infra Section III.A.iii., there is evidence in the record from which a jury could find that Defendant was on notice of the fact that Wadleigh had reported sexual harassment to Plaintiff on multiple occasions prior to her termination, and that Plaintiff had documented the complaints, but not reported them to Human Resources, and yet Covenant did not investigate Plaintiff's conduct. 2015 Pl. Dep. Tr. 77:8-22, Def. Ex. 14; Def. Ex. 26; Def. Ex. 34; Def. Ex. 35; Def. Ex. 39; Pl. Ex. A; Wadleigh Complaint, Def. Ex. 42. The record demonstrates that it was only after Plaintiff spoke with the mediator that Covenant decided to investigate whether Wadleigh had reported sexual harassment to Plaintiff prior to her termination and whether Plaintiff had violated any Covenant policies by not reporting her complaints to Human Resources immediately. Def. SOMF

¶¶ 135-36.  The Court finds that a jury could also infer a
causal link between Plaintiff's participation in the Wadleigh
Mediation and his termination based upon this additional
evidence.

Finally, Plaintiff testified that, upon confirming that
Plaintiff had spoken to the mediator during the Wadleigh
Mediation, one of Covenant's attorneys "[blew] a gasket" and,
infuriated, told Plaintiff--in expletive-ridden terms--that he
should not talk to anyone about Wadleigh's lawsuit.  2016 Pl.
Dep. Tr. 139:13-25, Def. Ex. 5.  Counsel vehemently contests
that he ever made such a statement.  See, e.g., Milavsky Dep.
Tr. 15:13-17:20; 45:16-46:19, Def. Ex. 30.  Nonetheless, this is
a genuinely disputed material fact.  If the jury chooses to
credit Plaintiff's version of the events, this is further
evidence from which the jury could infer causation.

Having considered the record in its totality, the Court
finds that there are clearly genuine disputes of material fact
as to whether Plaintiff has established causation, as required
to establish a prima facie case of retaliation under NJLAD.  As
a result, summary judgment due to Plaintiff's purported failure
to establish a prima facie case of NJLAD retaliation is
inappropriate and must be denied.

### ii.  Legitimate Non-Retaliatory Reason

Consistent with the McDonnell Douglas framework, the burden
of production now shifts to Defendant to articulate a
legitimate, non-retaliatory reason for terminating Plaintiff.
Tourtellotte, 636 F. App'x at 842.  Covenant contends that it
terminated Plaintiff's employment on October 31, 2014 because he
failed to immediately report Wadleigh's four complaints of
sexual harassment to Human Resources, as required by Covenant's
sexual harassment reporting policies.  The decision to terminate
Plaintiff's employment was the culmination of an investigation
conducted by Defendant's attorneys.  The Court finds that
Defendant has clearly met its burden of articulating a
legitimate non-retaliatory reason for its decision to terminate
Plaintiff.

### iii. Pretext

As Covenant has met its "minimal burden" of articulating a
legitimate, nonretaliatory reason for Plaintiff's termination,
the burden shifts back to Plaintiff to establish that the
proffered reason is merely pretext for retaliation.
Tourtellotte, 636 F. App'x at 842.

To establish pretext at this stage and, therefore,
withstand summary judgment, Plaintiff "'must point to some
evidence, direct or circumstantial, from which a factfinder
could reasonably either (1) disbelieve the employer's

articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Michaels, 604 F. App'x at 182 (quoting Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994)); Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 644 (3d Cir. 1998).  "It is not enough to show that the employer was 'wrong or mistaken'; rather, the 'plaintiff must demonstrate such 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] [non-retaliatory] reasons.'"  Ward v. Ingersoll-Rand Co., --- F. App'x ----, 2017 WL 1526309, at *3 (3d Cir. Apr. 28, 2017) (quoting Ross v. Gilhuly, 755 F.3d 185, 194 n. 13 (3d Cir. 2014)).

According to Defendant,

> Plaintiff [] **ignores the dispositive point** that . . . Covenant only became aware of the following facts through the Wadleigh Mediation and its subsequent investigations: (a) Ms. Wadleigh made four (4) sexual harassment complaints to Plaintiff; (b) Plaintiff documented each complaint on its respective date; (c) Plaintiff did not immediately report the complaint to Covenant; and (d) Plaintiff never sent the documented complaints or any pertinent information in the complaints to Covenant.

Def. Reply Br. at 1 [Docket No. 27] (emphasis in original).

The Court agrees with Defendant that the question of when
Defendant learned of these facts is dispositive. Yet there are
clearly genuine disputes of fact as to this dispositive issue,
thereby precluding summary judgment.

Plaintiff testified that, shortly before June 27, 2013, he
and Goehring spoke over the phone regarding Wadleigh and that
Plaintiff informed Goehring that Wadleigh had "complaints of her
own," "sexual and otherwise." 2015 Pl. Dep. Tr. 77:8-22,
79:9-14, Def. Ex. 14. Then, on July 1, 2013, Plaintiff sent an
email to Dennis, which read, in relevant part: "I documented
that Ms. Wadleigh had several complaints, sexual and other, she
wanted to report to me however I instructed her to make her
complaints in Philadelphia (HR) during her meeting with you and
Ben, since I was not involved with investigation. See
attached." Def. Ex. 34. He attached a Corrective Action Form,
dated June 27, 2013, which described, in relevant part:
"Ms. Wadleigh asked to report her own complaints of harassment
both sexual and other. . . . I advised I would document her
request." Id. Arguably, Plaintiff violated Covenant's policy
of reporting sexual harassment complaints within 24 hours of
receipt when he emailed Dennis this Corrective Action Form on
July 1, 2013, four days after the form was completed on June 27,
2013. Yet Covenant did not investigate the sexual harassment
complaints or Plaintiff's failure to abide by Covenant's

reporting policies at that time, nor did it discipline Plaintiff
in any way.

Later the same day, Plaintiff sent another email to Dennis
and Goehring, which read: "And if it was Tucker, you would
probably be quite interested in Ms. Wadleigh's sexual harassment
complaint, but again I will leave that to you[r] discretion."
Def. Ex. 35. There is no evidence in the record that Dennis or
Goehring ever responded to Yeager's email, let alone that they
investigated his comments or disciplined him.

On July 10, 2013, Wadleigh sent a letter to Brown, in which
she claimed that she had been sexually harassed by Tucker and
had "made Dave Yeager aware of [the] complaints." Def. Ex. 39.
Upon receiving the letter, Covenant did not institute an
investigation into her allegations or whether Yeager had failed
to report her complaints, in violation of Covenant's reporting
policies. 2016 Brown Dep. Tr. 28:16-29:1, Def. Ex. 10.

Wadleigh's attorney, McComb, sent Brown a letter on October
3, 2013, which specifically described the four instances of
sexual harassment that Wadleigh reported to Plaintiff and the
dates on which the alleged harassment occurred. Importantly,
the letter also stated:

> Ms. Wadleigh immediately reported each such occurrence
> to her supervisor, David Yeager. Although Mr. Yeager
> documented each complaint, he informed Ms. Wadleigh that
> she needed more evidence because, in Mr. Yeager's
> experience, Covenant did not take these types of

complaints seriously. . . . It is our understanding that prior to the [June 27, 2013] meeting, Mr. Yeager sent Mr. Goehring an email notifying him that Ms. Wadleigh had complained about incidents of workplace sexual harassment and asking Mr. Goehring whether he wanted to review Mr. Yeager's notes on the complaints. We believe that Mr. Yeager received no response to his inquiry.

Pl. Ex. A.[2] Finally, on December 11, 2013, Wadleigh filed a complaint against Covenant for NJLAD retaliation and wrongful termination. In the <u>Wadleigh</u> Complaint, Wadleigh alleged that she had been sexually harassed by Tucker on at least four occasions. Her pleadings described the four instances in detail and alleged, once again, that "[Wadleigh] immediately reported each such occurrence of harassment to her supervisor, David

---

[2] Covenant does not deny receiving this letter. Def. Resp. to Pl. SOMF ¶ 16 [Docket No. 27-1]. It does, however, attack the letter as "newly produced," noting that it is not Bates-stamped, was not produced in discovery in connection with this litigation or Wadleigh's litigation, and was not presented to any of Defendant's witnesses during their oppositions. Federal Rule of Civil Procedure 37(c)(1) provides that a party may not use information that was not provided as required by Rule 26 to supply evidence on a motion, unless the failure was substantially justified or is harmless. This letter was mailed to and received by Brown, Covenant's Vice-President of Human Resources. Thus, the document should have been in Defendant's possession since it was received by its Vice-President of Human Resources. There is no evidence that suggests that Brown did not receive the letter shortly after it was mailed on October 3, 2013. Additionally, the Court sees no reason why Plaintiff would have had this document in his possession, given that it was sent by Wadleigh's counsel to Brown long before counsel's firm began representing Plaintiff in this action. Even assuming that Plaintiff was under an obligation to disclose this letter in discovery, the Court finds that the failure to do so is harmless as Defendant should have been aware of the letter as it was already in Defendant's possession.

Yeager.  Although Mr. Yeager documented each complaint, he informed Plaintiff that she needed more evidence because, in Mr. Yeager's experience, Covenant did not take these types of complaints seriously."  Wadleigh Complaint ¶¶ 7-8, Def. Ex. 42.

The allegations set forth in McComb's letter and the Wadleigh Complaint--if true--describe "egregious" violations of Covenant's sexual harassment report policies.  See Def. Br. at 11, 12, 22, 26-27 [Docket No. 24-1] describing Plaintiff's violations of Covenant's reporting policies as "egregious"); 2016 Brown Dep. Tr. 30:5-31:5, Ex. 10 (admitting that the allegations in the Wadleigh Complaint--if true--are "pretty awful and not something you want going on at Covenant" and should be "addressed right away and remedied appropriately"). Yet, the record shows that Defendant did nothing.  Defendant did not speak with Plaintiff in an attempt to determine the veracity of these allegations.  Defendant did not investigate whether Plaintiff had indeed egregiously violated Covenant's policies. Instead, Defendant viewed the claims as "strictly allegations" and took no further action.  Id. 29:7-30:4.

Based upon this evidence, a jury could reasonably infer that Defendant was on notice that Plaintiff may have violated its sexual harassment reporting policies far earlier than August 15, 2014.  Construing all inferences in favor of the nonmoving party, this Court finds that a jury could also reasonably

conclude that, despite this notice, Defendant nonetheless chose
not to investigate the situation or discipline Plaintiff until
Plaintiff participated in the Wadleigh Mediation and expressed
his willingness to assist Wadleigh in her litigation against
Covenant.  In other words, if Plaintiff's version of events is
believed, the Defendant ignored Plaintiff's possible violation
of its sexual harassment reporting policies for anywhere between
eight and thirteen months, yet immediately commenced an
investigation into Plaintiff after he participated in the
Wadleigh Mediation, against Defendant's interests, which
resulted in his termination.  This is precisely the type of
implausibility, inconsistency, and incoherence from which a jury
could reasonably find that Defendant's proffered legitimate
reason is "unworthy of credence, and hence infer that
[Defendant] did not act for" its proffered reason.  Ward, 2017
WL 1526309, at *3.

     Additionally, Plaintiff testified that Covenant's attorney
became enraged when Plaintiff confirmed that he had spoken to
the mediator and that the attorney told him not to speak with
anyone about Wadleigh's lawsuit.  Whether this occurred is a
hotly disputed fact.  If the jury believes Plaintiff's
testimony, the jury may infer that Defendant was furious with
Plaintiff for his participation in the Wadleigh Mediation and
terminated his employment in retaliation for that participation,

although the Court recognizes the other, more likely inference, i.e. that Plaintiff was terminated for failure to timely report Wadleigh's complaints, in violation of Covenant's policies.

Having reviewed the record and resolved all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has carried his burden of establishing pretext. Accordingly, Defendant's Motion for Summary Judgment is denied as to Plaintiff's retaliation claim under NJLAD (Count I).

## B. **Wrongful Termination (Count II)**

Count II of Plaintiff's Complaint is entitled "Wrongful Termination". It appears to be a "catchall" claim that alleges as follows:

> Covenant's retaliatory termination of Yeager's employment violated clear mandates of public policy, namely, policies against sexual discrimination and retaliation set forth in the LAD, Title VII of the federal Civil Rights Act, the Equal Employment Opportunity Commission's regulations and guidelines, CEPA and the substantive due process provisions of the federal Constitution and the New Jersey State Constitution.

Complaint ¶ 41.

Defendant argues that Plaintiff's wrongful termination claim under Count II must be dismissed because it does not allege any facts distinct from his NJLAD retaliation claim and, therefore, is preempted by NJLAD. Def. Br. at 27. "Because of the broad availability of remedies under the LAD, both state and federal courts in New Jersey have frequently held that the LAD

bars common law claims based on the same operative facts as underlie the LAD claim." Taylor v. Lincare, Inc., 2016 WL 3849852, at *8 (D.N.J. July 15, 2016) (quoting Everson v. JPMorgan Chase Bank, 2013 WL 1934666, at *2 (D.N.J. May 8, 2013) (collecting cases)). Therefore, "[w]here the factual predicates for the common law claims and the NJLAD claims are the same and the remedies sought are the same, the common law claims are barred." Gaines v. United Parcel Serv., Inc., 2014 WL 1450113, at *5 (D.N.J. Apr. 14, 2014).

Plaintiff's wrongful termination claim set forth in Count II of the Complaint is clearly premised upon the same operative facts as his NJLAD retaliation claim. Count II expressly incorporates by reference all facts alleged in support of Plaintiff's NJLAD claim and adds only one additional paragraph, in which he alleges that "Covenant improperly terminated [his] employment with Covenant in retaliation for his reporting and complaining about Covenant's improper sexual harassment policies and procedures and supporting of Ms. Wadleigh's sexual harassment claims against Covenant." Complaint ¶¶ 39-40. Likewise, Plaintiff seeks identical remedies under both his NJLAD and wrongful termination claims. As a result, to the extent Count II states a common law wrongful termination claim, such claim is preempted by NJLAD.

Accordingly, summary judgment is granted as to Count II insofar as it states a common law wrongful termination claim.

In his opposition brief, however, Plaintiff contends that he also asserts a claim under New Jersey's Conscientious Employee Protection Act, N.J.S.A § 34:19-1, et seq. ("CEPA") in Count II of the Complaint.  Defendant responds that Count II only "vaguely alleges" violations of CEPA, but that any CEPA claim must be dismissed for the same reasons as the NJLAD retaliation claim.  Def. Reply Br. at 12 n. 5.[3]  As only common law claims arising from the same operative facts and seeking the same remedies as an NJLAD claim are preempted by NJLAD, NJLAD does not preempt Plaintiff's CEPA claim, which is a statutory cause of action.  Accordingly, summary judgment as to Count II of the Complaint, insofar as it sets forth a CEPA claim, is denied.  Moreover, Plaintiff's CEPA claim, to the extent it is properly asserted in the Complaint, survives

---

[3] The Court questions whether Plaintiff's passing reference to CEPA in the Complaint adequately gave Defendant notice that Plaintiff was pursuing a CEPA claim in this litigation.  The parties may wish to address this concern during the Joint Final Pre-Trial Conference and the Court will also entertain a pre-trial motion regarding this issue if Defendant believes this claim was abandoned.  To the extent Count II purports to assert wrongful termination claims under Title VII, the Equal Employment Opportunity Commission's regulations and guidelines, and the Constitutions of the United States and the State of New Jersey, the Court finds that Plaintiff has abandoned those claims as he did not defend them in his opposition brief.

summary judgment for the same reasons set forth above with
regards to Plaintiff's NJLAD retaliation claim.

CEPA claims, like NJLAD claims, are analyzed under the
McDonnell Douglas burden-shifting framework.  Bocobo v.
Radiology Consultants of S. Jersey, P.A., 477 F. App'x 890, 900
(3d Cir. 2012) (citing Fleming v. Corr. Healthcare Sols., Inc.,
164 N.J. 90, 100-01 (2000)).  To establish a prima facie case of
a CEPA violation, "a plaintiff must establish that (1) he
reasonably believed that his employer's conduct was violating a
law or rule or regulation promulgated pursuant to law, (2) he
objected to the conduct, (3) an adverse employment action was
taken against him, and (4) a causal connection exists between
the whistleblowing activity and the adverse employment action."
Sarnowski v. Air Brooke Limousine, Inc., 510 F.3d 398, 404
(3d Cir. 2007) (citing Dzwonar v. McDevitt, 177 N.J. 451, 462
(2003)).  The first two elements mirror the protected activity
element of NJLAD, which the parties do not dispute.  Likewise,
it is undisputed that Plaintiff suffered an adverse employment
action when he was terminated.  Finally, for the reasons set
forth above in connection with Plaintiff's NJLAD retaliation
claim, see supra Section III.A., there is a genuine dispute of
material fact regarding causation, precluding summary judgment.

As described above, Defendant has met its burden of
articulating a legitimate, non-retaliatory reason for

terminating Plaintiff's employment.  Plaintiff, however, for the reasons set forth above, has met his burden of establishing that Defendant's articulated reason is merely pretext for retaliation.  Accordingly, for the same reasons that summary judgment was denied as to Plaintiff's NJLAD retaliation claim, see supra Section III.A., summary judgment is also denied as to Count II, insofar as it sets forth a CEPA claim, and without prejudice to Defendant raising that such claim was not properly asserted in the Complaint or has since been abandoned.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted, in part, and denied, in part.  The motion is granted insofar as it relates to Plaintiff's common law wrongful termination claim.  The motion is denied as to all other claims.  An appropriate Order shall issue on this date.

s/Renée Marie Bumb
RENÉE MARIE BUMB
UNITED STATES DISTRICT JUDGE

Dated: June 13, 2017